IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID RONNIE CAIN, | ) | CASE NO. 1:17-cv-00894 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff David Ronnie Cain ("Plaintiff" or "Cain") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for Supplemental Security Income ("SSI") benefits. Doc. 1. This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 12. As explained more fully below, the Court

**AFFIRMS** the Commissioner's decision.

## I.  Procedural History

On May 27, 2014, Cain protectively filed[1] an application for Supplemental Security

Income ("SSI").[2] Tr. 14, 147-152. He alleged a disability onset date of April 1, 2012. Tr. 14,

147, 195. Cain alleged disability due to liver damage, personality disorders, hypothyroidism,

and prostate trouble. Tr. 62, 86, 93, 195. Cain's application was denied initially and upon

reconsideration by the state agency. Tr. 86-92, 93-97. Thereafter, he requested an

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application." http://www.socialsecurity.gov/agency/glossary/ (last visited 3/2/2018).

[2] Cain filed another application in 2013. Tr. 14, 34, 141-146. That claim was denied and not reopened. Tr. 14.

administrative hearing.  Tr. 98-109, 111.   On February 5, 2016, Administrative Law Judge

Joseph G. Hajjar ("ALJ") conducted an administrative hearing.  Tr. 29-60.

In his March 2, 2016, decision (Tr. 11-28), the ALJ determined that Cain had not been

under a disability within the meaning of the Social Security Act since May 27, 2014, the date the

application was filed (Tr. 14, 24).  Cain requested review of the ALJ's decision by the Appeals

Council.  Tr. 8-10, 246-248.  On February 28, 2017, the Appeals Council denied Cain's request

for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.      Personal, educational and vocational evidence

Cain was born in 1962.  Tr. 23, 147.  He is a veteran, having served in the Army in the

1980s.  Tr. 33, 39, 41.  He was 53 years old at the time of the administrative hearing.  Tr. 33.  He

was living with his girlfriend.  Tr. 38.  Cain stopped attending school in the 8th grade.  Tr. 40-41.

Cain last worked in 2011 and 2012 at Orbit Industries inspecting metal bars.  Tr. 41-46.  Cain

indicated his friend, who was a foreman at Orbit Industries, helped him get the job and worked

alongside him.  Tr. 42, 43, 44.

### B.      Medical evidence[3]

#### 1.      Treatment history

Cain received medical treatment through the Department of Veteran Affairs Medical

Center ("VA Medical Center").  Tr. 34.

On February 14, 2013, Cain saw social worker Diane Jagielski, LISW, for a

psychological assessment.  Tr. 299-302.  Ms. Jagielski noted that it was obvious Cain was

depressed.  Tr. 302.  He had a history of psychiatric hospitalizations and tried to overdose on

---

[3] Cain's arguments in this appeal pertain to his mental rather than physical impairments.  Accordingly, the medical
evidence summarized herein generally pertains to his mental impairments.

multiple occasions. Tr. 299, 302. However, Cain reported having good familial relationships and people at church who kept him from hurting himself. Tr. 299, 302-303. Cain reported only knowing of his biological father but having a very good relationship with his mother and step-father. Tr. 301-302. He reported he enjoyed hanging out with his mom and step-father and going fishing. Tr. 302. Cain also has three younger sisters with whom he got along when growing up. Tr. 302. Cain was reluctant to take any medication, fearing that medication would be mood or mind altering. Tr. 303. Ms. Jagielski encouraged Cain to stay open to taking medication for his depression and sleep, noting that medication that would be prescribed would not be habit forming. Tr. 303. Ms. Jagielski felt that much of Cain's depression was related to his continuing need to grieve for his grandmother because his grandmother died while he was in the military and he was unable to return home for her funeral. Tr. 301, 303. Ms. Jagielski diagnosed Cain with depression, anxiety, and personality disorder, NOS. Tr. 302. She assessed a GAF of 50.[4] Tr. 302. Ms. Jagielski recommended individual therapy and a psychiatric assessment. Tr. 303. Per Cain's request, he was assigned to Ms. Jagielski for individual psychotherapy sessions. Tr. 303.

On March 18, 2013, Cain saw Ms. Jagielski to formulate a treatment plan. Tr. 284-285, 286-288. Cain's goals were to decrease the intensity and frequency of his depression and increase his ability to concentrate. Tr. 284, 288. He was diagnosed with depression and personality disorder, NOS. Tr. 288. The treatment plan included therapy at least once each

---

[4] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

month and psychiatry visits at least twice each year.  Tr. 288.  Cain's treatment providers were Ms. Jagielski and nurse practitioner Melissa Zupancic.  Tr. 284, 288.  Ms. Jagielski was responsible for individual therapy and Nurse Zupancic was responsible for prescribing medication to manage Cain's symptoms and monitor his response.  Tr. 285.

The following day, on March 19, 2013, Cain met with Nurse Zupancic for medication management.  Tr. 282-283.  Cain's chief complaints were "no focus, concentration, anxiety and anger[.]"  Tr. 282.  He reported symptoms of racing heart, pounding heart, and mind racing.  Tr. 282.  Cain relayed a past history of substance abuse but indicated he had been sober for five years.  Tr. 282.  Cain reported periods of homelessness in the past and reported being unemployed.  Tr. 282.  Cain relayed past suicide attempts but he was not suicidal at that time.  Tr. 282.  He indicated he had family and people at church who kept him from hurting himself.  Tr. 282.  Cain reported being in a relationship with his fiancé on and off for 8-10 years.  Tr. 283.  He had seven children.  Tr. 283.  One had passed away.  Tr. 283.  Cain did not have contact with his children who lived out of state.  Tr. 283.  Nurse Zupancic diagnosed major depressive disorder; anxiety, NOS; substance abuse in full sustained remission; and personality disorder, NOS.  Tr. 283.  Nurse Zupancic assessed a GAF of 50.  Tr. 283.  Cain indicated he did not want medication because he would "feel like a zombie[.]"  Tr. 282.  Following discussions with Nurse Zupancic, Cain agreed to try medication to treat his anxiety.  Tr. 283.  Nurse Zupancic prescribed Sertraline.  Tr. 283.

On April 17, 2013, Cain saw Ms. Jagielski (Tr. 276-277) and Nurse Zupancic (Tr. 274-275).  During his visit with Ms. Jagielski, Cain reported that he was not doing well.  Tr. 276.  He was constantly on guard and did not want to be around groups of people, including his family even though he loved them and they loved him.  Tr. 276.  He was attending church with his

girlfriend but felt anxious when there and he had to sit in the back of the church. Tr. 276. Cain relayed that he did not like the medication he was taking because it upset his stomach and he did not feel it was working. Tr. 276. Ms. Jagielski encouraged Cain to speak with Nurse Zupancic regarding his medication concerns. Tr. 276. Ms. Jagielski diagnosed depression and personality disorder, NOS, and recommended continued therapy and medication management. Tr. 277. During his visit with Nurse Zupancic, Cain also reported feelings of not wanting to be around other people. Tr. 274. He relayed that he was too paranoid, did not know what was going on, and did not want to go back to drinking. Tr. 274. He indicated he loved his girlfriend and family but could not stand to be around them at times. Tr. 274. Cain was interested in trying to get a job but he had been unable to hold onto jobs. Tr. 274. His thoughts were "all jumbled up in [his] head." Tr. 274. Cain reported that he was not tolerating the Sertraline. Tr. 274. In order to try to address Cain's paranoia, Nurse Zupancic started Cain on Risperdal. Tr. 275. Nurse Zupancic continued to assess a GAF of 50. Tr. 275.

On April 18, 2013, Cain called to express concern that the Risperdal would reverse the effects of his Interferon treatment. Tr. 271-272. Nurse Zupancic spoke with Cain and advised Cain that she was not aware of any problems taking Risperdal while receiving Interferon treatments. Tr. 271. Cain agreed to try the new medication and call if he had any further issues/concerns. Tr. 271. As of April 22, 2013, Cain advised Nurse Zupancic that he had stopped his medicine because he was feeling "mopey" and his side was hurting. Tr. 270. Nurse Zupancic advised Cain that they would discuss his medication during his next visit. Tr. 270.

Cain saw Ms. Jagielski on May 15, 2013. Tr. 265-266. Cain reported that he had gone golfing twice in the prior month with his father and he had gone out to lunch and/or dinner with his girlfriend. Tr. 265. He still did not like being around people and he had a hard time going

out of the house. Tr. 265. However, he indicated he would continue to try. Tr. 265. Cain was

not working and was not looking for work because he did not like to be around people. Tr. 265.

Ms. Jagielski discussed with Cain places he could work where there would not be a lot of people.

Tr. 265. Cain agreed to look at the want ads in the newspaper. Tr. 265.

On June 5, 2013, Nurse Zupancic started Cain on Trazadone. Tr. 369. Cain indicated

that Trazadone had helped in the past and he was able to tolerate it. Tr. 369. Later that month,

on June 17, 2013, Cain saw Ms. Jagielski (Tr. 367-368) and Nurse Zupancic (Tr. 364-366). Ms.

Jagielski noted that Cain did not make eye contact during his visit with her. Tr. 368. He was

only getting out of the house to go to his parents' house or to his girlfriend's house. Tr. 367-368.

When at his girlfriend's house, they would go out on her golf course but Cain did not want to go

where there were people. Tr. 367. He had not really looked for a job. Tr. 368. Cain continued

to indicate that he did not want to be around people. Tr. 368. Ms. Jagielski again encouraged

Cain to look for jobs that did not require him to be around people. Tr. 368. During his session

with Nurse Zupancic, Cain reported fleeting suicidal thoughts but no plans. Tr. 365. He

indicated that his family and girlfriend love and support him so much that he could never hurt

himself. Tr. 365. Cain reported that he no longer felt that he was in a fog and he felt that the

Trazadone was helping him a good deal. Tr. 365. It was helping him sleep. Tr. 365. Nurse

Zupancic observed that Cain's grooming had improved and he appeared to be more trusting and

less apprehensive. Tr. 365. During her mental status examination of Cain, Nurse Zupancic also

observed that Cain was cooperative, polite, made good eye contact and had normal psychomotor

activity. Tr. 365. Cain's speech was a normal rate, volume and intonation. Tr. 365. He was

alert and oriented. Tr. 365. His mood was dysthymic; his affect was full; and his judgment and

insight were fair. Tr. 365. Nurse Zupancic continued to assess a GAF score of 50. Tr. 366.

Nurse Zupancic noted that Cain was responding well to the Trazadone but still waking up frequently so she increased Cain's Trazadone dosage.  Tr. 366.

Cain saw Ms. Jagielski (Tr. 456-457) and Nurse Zupancic on August 6, 2013 (Tr. 457-459).  Cain had stopped taking the higher dosage of Trazadone because he did not like how it made him feel.  Tr. 456.  As a result, he was only sleeping for an hour or two.  Tr. 456.  Cain indicated he did not want to take medication for his depression because of the way it made him feel and he felt he had tried everything before and it did not work.  Tr. 456.  Cain relayed that he felt that he had wasted his brain when he took drugs in the past, indicating he was unable to remember things and could not concentrate.  Tr. 456.  Ms. Jagielski encouraged Cain to continue to participate in pleasurable activities.  Tr. 456.  Cain indicated he had been helping his parents out and seeing his sister, which he liked doing.  Tr. 456.  On mental status examination, Nurse Zupancic observed that Cain was cooperative, polite, made good eye contact and had normal psychomotor activity.  Tr. 458.  Cain's speech was a normal rate, volume and intonation.  Tr. 458.  He was alert and oriented.  Tr. 458.  His mood was dysthymic; his affect was full; and his judgment and insight were fair.  Tr. 458.  No suicidal or homicidal ideas were present.  Tr. 458.  Nurse Zupancic continued Cain on Trazadone.  Tr. 459.  She noted that, Cain remained significantly depressed but did not want medication to help him.  Tr. 459.

Cain saw Nurse Zupancic on October 16, 2013.  Tr. 519-521.  Cain stated "My mind is terrible, disoriented--I can't concentrate on anything[.]"  Tr. 520.  On mental status examination, Nurse Zupancic indicated that Cain was cooperative, polite, made good eye contact, had normal psychomotor activity; his speech rate, volume and intonation were normal; he was alert and oriented; his mood was dysthymic; his affect was full; and his insight and judgment were fair.

Tr. 520-521.  No suicidal or homicidal ideas were present.  Tr. 521.  Nurse Zupancic continued Cain on Trazadone.  Tr. 521.  Cain's GAF scored remained a 50.  Tr. 521.

On November 22, 2013, Cain saw Nurse Zupancic.  Tr. 510-512.  Cain reported not sleeping the night before and feeling "cloudy" – like his brain wasn't working.  Tr. 511.  After increasing his Trazadone dosage, Cain started having hot and cold flashes and nausea.  Tr. 511.  Nurse Zupancic recommended tapering Cain off of Trazadone.  Tr. 511.  Nurse Zupancic indicated that Cain was scheduled for neuropsych testing on December 10.  Tr. 511.  On mental status examination, Nurse Zupancic indicated that Cain was cooperative, polite, made good eye contact, had normal psychomotor activity; his speech rate, volume and intonation were normal; he was alert and oriented; his mood was dysthymic; his affect was constricted; and his insight and judgment were fair.  Tr. 511.  No suicidal or homicidal ideas were present.  Tr. 511.  Nurse Zupancic assigned a GAF score of 50.  Tr. 512.

Cain saw Nurse Zupancic on January 28, 2014.  Tr. 505-507.  Cain had cancelled two prior appointments and he did not follow up with the neuropsych testing.  Tr. 505-506.  Nurse Zupancic noted that Cain had significant sadness and depression and continued to come back to the clinic so it was clear he was searching for help.  Tr. 506.  Cain relayed that he did not get along with is step-father, noting they bickered all the time.  Tr. 506.  On mental status examination, Cain's affect was full.  Tr. 506.  Otherwise, his mental status examination was similar to prior examinations.  Tr. 506.  Nurse Zupancic noted that Cain was willing to try medication.  Tr. 506.  She prescribed Paxil and instructed him to remain on it for 4 weeks.  Tr. 507.

On March 20, 2014, Cain saw Nurse Zupancic and relayed that he was not sleeping well.  Tr. 493.  Nurse Zupancic suggested over-the-counter melatonin to help him sleep.  Tr. 493.  Cain

had taken his medication for the prior month.  Tr. 493.  He did not notice much of a difference in his anxiety and mood but he appeared calmer and had less apprehension or mistrust.  Tr. 493.  Nurse Zupancic recommended increasing Cain's Paxil dosage.  Tr. 494.  Cain's mental status examination was similar to past examination except his affect was constricted rather than full and his speech was normal but slow  Tr. 493-494.

A few weeks later, on April 7, 2014, Cain saw Nurse Zupancic and he reported he was not sleeping well.  Tr. 487.  Nurse Zupancic advised Cain that he needed to try melatonin for a longer period of time in order to assess its effectiveness.  Tr. 487.  Cain was not noticing much of a difference in his anxiety or mood but Cain appeared calmer and had less apprehension or mistrust.  Tr. 487.  Also, Cain's girlfriend and her mother, with whom Cain lived, noticed improvement.  Tr. 487.  Cain's mental status examination was similar to his last examination.  Tr. 487.  He reported that he was continuing to have memory problems and depression which he felt kept him from functioning.  Tr. 488.  Cain reported that the Paxil was tolerable and partially effective.  Tr. 488.  Nurse Zupancic recommended an increase in Paxil dosage.  Tr. 488.  Nurse Zupancic was leaving and agreed to follow up with her replacement.  Tr. 487.

On May 7, 2014, Cain started seeing Phyllis Goldbach, a clinical nurse specialist.  Tr. 484-486.  Nurse Goldbach noted that Cain was friendly and cooperative with her.  Tr. 485.  She noted that Cain's mood was "ok."  Tr. 485.  His affect was mildly anxious, constricted and congruent with no lability noted.  Tr. 485.  Cain's thought process was linear and goal-directed.  Tr. 485.  He denied suicidal or homicidal ideation.  Tr. 485.  Cain was living with his girlfriend and indicated his family and girlfriend were supportive.  Tr. 485.  Cain was eating okay and he was sleeping well with Trazadone.  Tr. 485.  Cain relayed that he still had a tendency to isolate himself.  Tr. 485.  However, with summer approaching, Cain indicated that they planned on

camping.  Tr. 485.  Nurse Goldbach diagnosed major depressive disorder and unspecified

anxiety disorder.  Tr. 485.  She continued Cain on Trazadone for sleep and on Paxil for

anxiety/depression/mood.  Tr. 485.

On June 12, 2014, Cain returned to see Nurse Goldbach.  Tr. 480-483.  Cain was

compliant with his medication and reported that he felt his medication was working well without

side effects.  Tr. 481.  The next month, on July 16, 2014, Cain saw Nurse Goldbach.  Tr. 534.

He reported having racing thoughts and not sleeping well.  Tr. 534.  Cain recently learned that he

was the father to a three-year old girl and he planned to petition the court for visitation.  Tr. 534.

Nurse Goldbach continued Cain's Trazadone and Paxil and added Risperdal for

irritability/anxiety/sleep/restlessness/racing thoughts.  Tr. 535.

On November 12, 2014, Cain started seeing a new nurse – Leslie Powell, NP.  Tr. 782-

785.  Nurse Powell's assessment was personality disorder, NOS; depressive disorder, NOS; and

anxiety disorder, NOS.  Tr. 785.  Cain was not taking his Trazadone or Risperdal regularly

because it made him feel "doped up."  Tr. 785.  Nurse Powell continued Cain on Paxil,

discontinued the Trazadone and Risperdal, and instructed Cain to start Mirtazapine at bedtime.

Tr. 785.  Cain had stopped attending counseling sessions for over a year and was not interested

in resuming counseling.  Tr. 785.

The following month, on December 11, 2014, Cain saw Nurse Powell.  Tr. 773-775.

Cain relayed that the new medication was "better than the other stuff" but his sleep was still

broken.  Tr. 774.  Cain was not taking his sleep medication every night; he was only taking

when he really needed sleep.  Tr. 774.  Cain indicated that his mind continued to race.  Tr. 774.

During the day, Cain reported sitting and rocking.  Tr. 774.  He was attending church weekly.

Tr. 774.  His girlfriend took care of the shopping.  Tr. 774.  Although he felt like being alone, he

planned to be with his family for the holidays.  Tr. 774.  His family wanted him to be with them more than he wanted to.  Tr. 774.  Cain reported that he would not mind being dead but he had no suicidal plan.  Tr. 774.  Nurse Powell observed a negative attitude and constricted affect.  Tr. 774.  Cain answered questions appropriately but did not volunteer information.  Tr. 774.  His judgement and insight were fair.  Tr. 774.  Cain avoided eye contact and looked at the floor for most of the session.  Tr. 774.  Nurse Powell continued Cain's medication and encouraged him to consider counseling.  Tr. 775.

Cain saw Nurse Powell on February 5, 2015.  Tr. 726-729.  Nurse Powell observed that Cain's attitude was more positive.  Tr. 727.  He was enjoying time with his 3 ½ year-old daughter.  Tr. 727.  He had visitation rights but his daughter's mother was playing games so Cain was going back to court to enforce his visitation rights.  Tr. 727.  Cain was enjoying spending time with his family.  Tr. 727.  He planned to see his mother on the weekend for her birthday and he was helping take care of his girlfriend's 86 year-old mother.  Tr. 727.  Cain's focus and concentration were not good and he was unable to work.  Tr. 727.  Also, his sleep was not good. Tr. 727.  Cain was only taking his sleep medication if he was up for days.  Tr. 727.  Cain had limited eye contact during the session.  Tr. 728.  His affect was "constricted, closer to full[.]"  Tr. 728.  He denied suicidal and homicidal ideation.  Tr. 728.  Cain's insight and judgment were "fair to good[.]"  Tr. 728.  Nurse Powell suggested adding another medication for mood/sleep. Tr. 728.  Cain declined the additional medication, indicating he felt strong enough and did not want to add anything additional to make him feel funny.  Tr. 728.

On March 31, 2015, Cain saw Nurse Powell with complaints that his sleep was still not good.  Tr. 722.  He was taking a ½ tablet of Mirtazapine which helped him fall asleep but he was awake again in an hour with his mind racing.  Tr. 722.  Cain was taking naps during the day

without Mirtazapine. Tr. 722. Cain was having problems with visitation but was motivated to see his daughter. Tr. 722. Cain was also in contact with one of his older daughters and was looking forward to visiting with her in the near future. Tr. 722. Cain was attending church and getting support there. Tr. 722. He continued to visit with his mom and dad and a friend was picking him up for meetings. Tr. 722-723. Nurse Powell observed that Cain's attitude was "open, calm[.]" Tr. 723. His affect was "constricted, bordering full range[.]" Tr. 723. Cain's thought process was linear, he answered questions appropriately, and he was talkative. Tr. 723. His insight and judgment were "fair to good[.]" Tr. 723. He had very limited eye contact. Tr. 723. Cain reported passive suicidal ideation, i.e., wishing that God would take him but against his religion to commit suicide. Tr. 724. Cain was continuing to have problems around adults/strangers but was doing okay with family and kids. Tr. 724. Nurse Powell continued Cain's medications. Tr. 724.

On May 13, 2015, Cain saw Nurse Powell. Tr. 717-719. Cain was not doing well. Tr. 719. He was continuing to have issues regarding visitation with his daughter. Tr. 719. He was not attending church or meetings. Tr. 719. Nurse Powell discussed medication changes for his mood/depression. Tr. 719. Cain was willing to try a low dose lithium for a week or two. Tr. 719.

During visits with Nurse Powell on June 22, 2015 (Tr. 709-711) and August 17, 2015 (Tr. 706-709), Cain continued to report being frustrated with visitation issues and problems with sleep (Tr. 708, 711). Cain also reported concerns that his aging parents were not doing well in their health. Tr. 708. Cain continued to report limited activity outside of his house. Tr. 708. His girlfriend continued to be his primary support. Tr. 708. He continued to have contact with his parents, sisters and older daughter. Tr. 708. Cain declined the option of returning to therapy

or counseling, indicating he did not recall a positive benefit from counseling. Tr. 708. Nurse Powell started Cain on a new medication – bupropion. Tr. 708.

On November 19, 2015, Cain contacted Nurse Powell regarding a refill on one of his prescriptions. Tr. 701. He relayed that the new medication was helping. Tr. 701. He felt his ability to concentrate was a little better but his mind still wandered and he had some headaches. Tr. 701. Cain had received temporary custody of his daughter. Tr. 701. On November 30, 2015, Cain saw Nurse Powell. Tr. 699-701. Cain had his daughter with him at the session and reported that his mom, brother and girlfriend were helping him with his daughter. Tr. 699. Cain was attending church weekly with his daughter and girlfriend. Tr. 699. Overall, his mood was better. Tr. 699. Cain felt that it had been helpful to have his daughter in the house. Tr. 699. Cain reported an argument with his sister at Thanksgiving but they had since worked out their differences. Tr. 699. Cain had been getting out for walks and was going to the park with his daughter. Tr. 700. He was still having some anxiety and racing thoughts but not as bad as it had been. Tr. 700. He was still having problems sleeping – he was waking 4-5 times throughout the night. Tr. 701. Nurse Powell continued Cain on his current doses of medication. Tr. 701.

### 2.     Medical opinion evidence

#### *Consultative examining medical opinion*

On June 27, 2013, clinical psychologist Richard N. Davis conducted a consultative psychological evaluation. Tr. 350-355. Mr. Davis noted that Cain presented as very depressed and paranoid and it was "an almost impossible task" to get information from him. Tr. 350, 352, 353. Mr. Davis diagnosed major depression, recurrent, severe with Cain indicating psychotic features; polysubstance dependence, noting that Cain indicated he had not used any alcohol or drugs other than those prescribed in 5 or 6 years; and personality disorder (mixed). Tr. 354. As

part of his diagnosis, Mr. Davis noted that Cain was experiencing rather severe stresses; Cain had few skills to deal effectively with life; and Cain was suicidal most of the time. Tr. 354. Mr. Davis assessed a GAF score of 42. Tr. 354. Mr. Davis' functional assessment was as follows:

1. This individual's behavior on this date suggests that he has difficulty in understanding, remembering and carrying out even simple instructions. His behavior was not consistent in my office. Sometimes he heard me and would answer a question and sometimes would seem to be somewhere else.

2. He had trouble paying attention and concentrating on those things that I was asking him. Sometimes he was having trouble concentrating and at other times didn't want to be bothered.

3. He has trouble with supervisors and co-workers because of his behavior.

4. He does not deal well with the stresses and pressures of employment settings. He says he doesn't want to be bothered with people and leaves a work setting.

Tr. 354. In summary, Mr. Davis also stated that:

This is an individual who apparently came from a dysfunctional family and says that he was physically and sexually abused by his father. However earlier he told me that he had never met his father, didn't know him and his father wasn't in his life. Again I am not certain as to what is truthful and what is not. I am not certain that the client even knows. He came to this office accompanied by a woman and I asked him his relationship of her to him and he said, "She's a relative." I was never able to get him to tell me whether she was a sister or sister-in-law or whether she was even related to him at all.

He is restricted in his daily activities, saying that he spends his days at his relatives and he sits in the garage and avoids them as much as possible. He appears to be limited intellectually and had trouble in school. He eventually left school and then was able to have people take tests for him so that he could get into the Army. He is able to care for his personal needs and his appearance was shabby. He has almost no ability whatsoever to relate satisfactorily to others. He had no difficulty hearing or speaking. He had no difficulty sitting, standing or moving about in my presence. He is severely limited in his abilities to think logically, use common sense and judgment.

Tr. 354-355.

*Reviewing medical opinions*

On July 31, 2014, state agency reviewing psychologist Ellen Rozenfeld, Psy.D.,
completed  Psychiatric Review Technique ("PRT") (Tr. 64-66) and Mental RFC Assessment (Tr.
68-69).   In the PRT, Dr. Rozenfeld opined that Cain had mild restrictions in activities of daily
living; moderate difficulties in maintaining social functioning; moderate difficulties in
maintaining concentration, persistence or pace; and no repeated episodes of decompensation,
each of an extended duration.  Tr. 65.  In the Mental RFC Assessment, Dr. Rozenfeld found no
understanding and memory limitations and no adaptation limitations.  Tr. 68, 69.   In the area of
sustained concentration and persistence, Dr. Rozenfeld found that Cain was moderately limited
in his ability to carry out detailed instructions; moderately limited in his ability to maintain
attention and concentration for extended periods of time; and moderately limited in his ability to
complete a normal workday and workweek without interruptions from psychologically based
symptoms and to perform at a consistent pace without an unreasonable number and length of rest
periods.  Tr. 68.  Dr. Rozenfeld further explained that Cain would be able to perform work duties
that were simple and routine in nature.  Tr. 68.  In the area of social interaction, Dr. Rozenfeld
found that Cain was limited as follows: moderately limited in his ability to interact appropriately
with the general public; moderately limited in his ability to accept instructions and respond
appropriately to criticism from supervisors; and moderately limited in his ability to get along
with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 68-69.
Dr. Rozenfeld further explained that Cain's ability to interact and get along with the general
public, coworkers, and supervisors was moderately limited but adequate for occasional contact.
Tr. 69.  Overall, Dr. Rozenfeld opined that, "from a psychological perspective, . . . [Cain]

retain[ed] the ability to perform simple repetitive tasks on a sustained basis in a work setting with occasional contact with others."  Tr. 69.

Upon reconsideration, on December 10, 2014, state agency reviewing psychologist Leslie Rudy, Ph.D., completed a PRT (Tr. 77-78) and a Mental RFC Assessment (Tr. 80-81).  Dr. Rudy's opinions were the same as those of Dr. Rozenfeld.  Tr. 64-66, 68-69, 77-78, 80-81.

**C.      Testimonial evidence**

**1.      Plaintiff's testimony**

Cain was represented and testified at the hearing.  Tr. 37-52, 55, 56.  When asked why he applied for social security disability, Cain indicated, "I just need help.  I mean, I need help. That's why I go to the VA, you know.  The stamps help, but it would be nice to . . . have help." Tr. 46.  Cain clarified that, "by help," he meant "financial help[.]"  Tr. 46.  Cain indicated he has tried to get a job but nothing works out.  Tr. 46.  Cain indicated he has a hard time concentrating. Tr. 46, 47.  Cain's girlfriend provides him with reminders for just about everything.  Tr. 51.  He takes medication to help him with his concentration problems.  Tr. 47.  His medical providers have changed his medications several times.  Tr. 47.  Cain is not sure whether his medications help him.  Tr. 52.

Cain spends most of the day lying down.  Tr. 47.  He does not help with chores.  Tr. 47-48.  He has been grocery shopping but did not like it because he does not like being around a lot of people.  Tr. 48.  Cain does not belong to any social groups.  Tr. 48.  Cain watches movies with his girlfriend.  Tr. 49.  He is not always able to follow the plot and/or falls asleep during the movie.  Tr. 49.

Cain has eight children.  Tr. 49.  His youngest child was 4 years old at the time of the hearing and was living with him and his girlfriend.  Tr. 49-50.  Cain's girlfriend takes him and

his daughter to the park and Cain will watch his daughter play.  Tr. 51.  They go to McDonald's

but only through the drive-thru because Cain feels there is too much noise inside the

McDonald's.  Tr. 50-51.  Cain does not like to eat out at sit-down restaurants – he would rather

eat at home.  Tr. 52.

Cain keeps in contact with one friend who calls Cain to say hello and to see how he is

doing.  Tr. 52.  Also, Cain's children call him.  Tr. 52.

### 2. Vocational Expert's testimony

Vocational Expert ("VE") James Lozer testified at the hearing.  Tr.  52-59, 244.  The

VE classified Cain's prior work as an inspector – a sedentary, unskilled position.  Tr. 54.  The

ALJ asked the VE to assume a hypothetical individual, the same age and with the same

education and past job experience as Cain, who is limited as follows – can perform a full range

of medium work; can perform simple, routine tasks; can have occasional interactions with

supervisors, coworkers, and the public; and can only tolerate routine workplace changes.  Tr. 54-

55.  The VE indicated that the described individual would be unable to perform Cain's past work

but there were medium, unskilled jobs that the described individual could perform, including (1)

custodian; (2) dishwasher; and (3) laborer.  Tr. 55-56.  The VE provided national job numbers

for each of the identified jobs.  Tr. 55-56.

The ALJ then asked the VE to assume the previously described individual except that the

individual could have no interaction with the public.  Tr. 56.  The VE indicated that the

dishwasher and laborer positions would remain and the custodian position would remain but at a

reduced number.[5]  Tr. 56.

---

[5] In response to the first hypothetical, the VE identified approximately 1,330,000 custodian jobs in the nation.  Tr. 55.  In response to the second hypothetical, the VE indicated that the number of custodian jobs in the nation would be reduced to approximately 500,000.  Tr. 56.

The VE also testified that an employer's tolerance for an employee to be off-task was 10% and an employer's tolerance for absences from work was 2.5 days per month. Tr. 56-57. Therefore, if the ALJ added to either of the hypotheticals that the individual would be off-task more than 10% or would be absent for 2.5 or more days, the VE indicated that there would be no work available for the described individuals. Tr. 57.

Cain's counsel asked follow-up questions. Tr. 57-58. First, he asked the VE to consider the first hypothetical except that the individual would be unable to have contact with anyone, including the public, coworkers or supervisors. Tr. 58. The VE indicated that that additional restriction would eliminate all jobs. Tr. 58. Cain's counsel then asked the VE to consider the first hypothetical with the additional restriction of requiring close supervision, meaning a supervisor would need to come by the individual at least four times each day and redirect the individual and make sure that the individual knew what he was doing and explain the process to the individual again. Tr. 58. The VE indicated that such a restriction would be work preclusive. Tr. 58-59.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy[6] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[7] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

---

[6] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

[7] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 416.925.

at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his March 2, 2016, decision, the ALJ made the following findings:[8]

1.    Cain had not engaged in substantial gainful activity since May 27, 2014, the application date. Tr. 16.

2.    Cain had the following severe impairments: depressive disorder, anxiety disorder, and irritable bowel syndrome. Tr. 16-17. Cain also had non-severe impairments, including drug and alcohol abuse in remission, hepatitis C, hypothyroidism, hypertension, and urinary problems. Tr. 16-17.

3.    Cain did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 17-19.

4.    Cain had the RFC to perform medium work as defined in 20 C.F.R. § 416.967(c) except he was limited to simple, routine tasks; he could occasionally interact with coworkers and supervisors but have no interaction with the public; and he could tolerate routine workplace changes. Tr. 19-23.

5.    Cain had no past relevant work. Tr. 23.

6.    Cain was born in 1962 and was 51 years old, defined as an individual closely approaching advanced age on the date the application was filed. Tr. 23.

7.    Transferability of job skills was not an issue because Cain did not have past relevant work. Tr. 23.

8.    Considering Cain's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Cain could perform, including custodian, dishwasher, and laborer. Tr. 23-24.

The ALJ determined that Cain had not been under a disability, as defined in the Social Security Act since May 27, 2014, the date the application was filed. Tr. 24.

---

[8] The ALJ's findings are summarized.

## V. Law & Analysis

### A.      Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### B.      Reversal and remand is not warranted

Cain argues that the opinions of his treating physicians and consultative examiner support a finding of disability and that the ALJ did not assign appropriate weight to opinions contained

within treatment records from the VA Medical Center and did not assign appropriate weight to the opinion of consultative examiner Mr. Davis. Doc. 13, pp. 1, 9-12.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c). An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

It is not entirely clear what treating physician opinion(s) Cain contends the ALJ did not properly weigh. He does not identify the name of the treating physician(s). And, in the "Analysis" section of his brief, he refers only generally to doctors at the VA Medical Center.

Doc. 13, pp. 9-12. There is a reference to "opinions" in the section of Cain's brief entitled "Procedural History and Background." Doc. 13, p. 6. He asserts that he was treated at the VA Medical Center and consistently assigned a GAF score of 50 and the ALJ "gave little weight to these treating source opinions." Doc. 13, p. 6.

For claims like Cain's that are filed prior to March 27, 2017, the regulations define a "treating source" as a claimant's "own acceptable medical source" who "provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §416.927(a)(2). Further, for claims filed prior to March 27, 2017, "acceptable medical source" includes licensed physician, licensed psychologist, licensed optometrist but does not include licensed advanced practice registered nurse or social workers. 20 C.F.R. 416.902(a). Cain received most of his mental health treatment at the VA Medical Center from nurses or a social worker and he has not shown that the GAF scores were assigned by an acceptable medical source. Rather, the record indicates that the GAF scores were assigned by nurses. *See e.g.*, Tr. 283, 275, 366, 512, 521. Thus, although Cain may have had a treatment history with the nurses who treated him and assigned GAF scores of 50, they are not "treating sources" subject to controlling weight analysis under the treating physician rule. *See e.g., Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (treating chiropractor was an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record).

Furthermore, as summarized by another court in this District, the Sixth Circuit has taken a case-by-case approach regarding the value of GAF scores and has indicated that, while ". . . a GAF score may be of considerable help to the ALJ in formulating the RFC[,]" a "GAF score is

not essential to the RFC's accuracy[.]" *See Walsh v. Colvin*, 2016 WL 1752854, * 15-16 (N.D. Ohio May 3, 2016) (internal citations and quotations omitted). Also, an ALJ is "not . . . required to place any particular amount of weight on a GAF score . . . [and] the failure to reference a GAF score is not, standing along, sufficient ground to reverse a disability determination." *Id.*at * 16 (internal citations and quotations omitted).

In Cain's case, the ALJ did consider and weigh the GAF scores of 50 assigned by VA Medical Center providers. Tr. 22. The ALJ assigned little weight to the scores, stating:

> The undersigned gives little weight to the GAF scores in the record from the VA, of 50, which indicate serious limitations in functioning. A GAF score is a non-standardized assessment of a claimant's functioning, and does not provide an analysis of an individual against a large sample size. In addition, the rating scale is general and does not necessarily signify an exact scale, wherein a GAF score of 40 would indicate half the level of functional ability as a GAF score of 80. In addition, these scores only demonstrate a claimant's functioning at a specific time, and not an overall pic ture of day-to-day abilities. Further, the score of 50 and implied limits in functioning are inconsistent with the claimant's stable treatment modality, as well as his presentation during examinations.

Tr. 22-23

Assuming, without needing to decide, that a GAF score constitutes an "opinion," since the GAF scores were not offered by acceptable medical sources and since the ALJ explained the weight assigned to the GAF scores and the reasons for that weight, the Court finds no basis upon which to reverse or remand the Commissioner's decision for further consideration of the GAF scores.

Cain's argument that the ALJ did not properly weigh the opinion of the consultative examiner Mr. Davis is also without merit. Mr. Davis was not a treating source provider. Further, although not a treating source provider, the ALJ explained the reasons for providing little weight to Mr. Davis's opinion, stating:

The consultative examiner, Mr. Davis, opined the claimant's behavior suggested he would have difficulty in understanding, remembering, and carrying out even simple instructions, and would have trouble concentrating (Ex. 4F/6). He opined the claimant had trouble with coworkers and supervisors, and would not deal well with stress and pressures of employment settings, noting the claimant had almost no ability to relate satisfactorily to others, or to think logically, use common sense, and use judgment (Ex. 4F/6). The undersigned gives this opinion, as well as the GAF score of 42, indicating serious limitations in functioning, little weight. The undersigned gives this opinion little weight because it was made during a one-time examination. Further, the undersigned notes that this examination, showing significant cognitive problems, is inconsistent with the claimant's VA examinations, where he had overall normal memory and cognitive function, as well as fair to good insight and judgment (Exs. 7F, 8F). Further, Mr. Davis noted the claimant was not cooperative and gave inconsistent answers during the examination, making the findings questionable. For these reasons, the undersigned gives this opinion little weight.

Tr. 22.

Cain contends that the ALJ did not assign proper weight to Mr. Davis' opinion and improperly concluded that the state agency reviewing physicians' opinions were more consistent with the record as a whole than Mr. Davis's opinion. Therefore, he argues, reversal is warranted. Cain's argument amounts to a request that this Court consider the case de novo, which is not this Court's role. Cain disagrees with the ALJ's weighing and assessment of the medical opinions but fails to show that the ALJ failed to consider the entirety of the record;[9] that the ALJ failed to adhere to the regulations when weighing the medical opinion evidence; or that the RFC is unsupported by substantial evidence. For example, a number of times in his brief, Cain indicates that the evidence shows that he is unable to be around the public. Doc. 13, p. 8. However, the ALJ took this evidence into account. In fact, the RFC includes a limitation of no interaction with the public. Tr. 19. Additionally, the RFC limits Cain to simple, routine tasks; only occasional

---

[9] Cain refers to a letter from Nurse Powell to Cain dated May 13, 2016, which states in part " your symptoms are numerous and intense enough that it would be unlikely that you would be able to successfully find and maintain employment." Doc. 13, p. 8 (citing Tr. 892). Any reliance by Cain on this letter to demonstrate error by the ALJ is misplaced since the letter post-dates the ALJ decision.

interaction with coworkers and supervisors; and only routine workplace changes. Tr. 19. The

Court finds that Cain has not shown error with respect to the weighing of Mr. Davis' opinion.

Further, he has not shown that the ALJ's restrictive RFC is unsupported by substantial evidence

or does not sufficiently account for his limitations. Accordingly, the Court finds that reversal

and remand is not warranted.

### VI. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated: March 5, 2018

_____
Kathleen B. Burke
United States Magistrate Judge